USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 7/31/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEVON MILLER,

Petitioner,

v.

SUPERINTENDENT OF THE
SHAWANGUNK CORRECTIONAL
FACILITY,

Respondent.

No. 18-CV-1762 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Petitioner Devon Miller, proceeding *pro se*, brings this petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  Miller was convicted in New York State Supreme Court of murder

in the first-degree and criminal possession of a weapon in the second degree and sentenced to life

in prison without parole.  For the reasons set forth below, the petition is denied.

## BACKGROUND

### I.    The Crime

On April 13, 2008, eighteen-year-old Chelsea Frazier was killed while she sat in her car

with her infant child and common law husband, Carlos Cruz.  According to eye witnesses,

including Cruz, a man approached and shot into the car.  Frazier was shot eight times.  Cruz was

also shot in the leg.

En route to the hospital, Cruz told the police that a black male "had approached and took

his chain and that he shot his girl" and "shot him once in the leg."  Dkt. 28, Tr. 16:24-25, 17:1,

17:7-8.  He also reported that "a green SUV had pulled up" behind Frazier's car before the

shooting.  *Id.* at Tr. 17:5.  Eyewitnesses also told officers that the shooter was "a male black

described as husky, with either dreds or braids" who had fled in a "green SUV." *Id.* at Tr. 18:3-4, 19:24-25.

Later that day, Detective Jalin Bulding went to the hospital to see Cruz. There, he noticed "a male . . . that had visited Mr. Cruz, and he had braids in his hair." *Id.* at 18:11-12. Detective Bulding later learned that this man – Miller – was Cruz's cousin and had a criminal history. At the hospital, Frazier's family also told Detective Bulding that "they were suspicious of Carlos Cruz." *Id.* at Tr. 17:16-17. Shortly thereafter, Detective Bulding discovered that Miller's father owned "a green SUV registered in [his] name." *Id.* at Tr. 20:5-6.

The next day, on April 14, Detective Bulding returned to the hospital. Miller was there again, along with other family members. Detective Bulding "asked Mr. Cruz if he would come back and view photos on our photo system . . . at the precinct." *Id.* at Tr. 22:1-3. Cruz agreed and was driven to the precinct by Detectives Bulding and Nicholas Speranza in the backseat of an unmarked police car. *See id.* at Tr. 22:13-14. Viewing Miller as "a possible witness," Detective Bulding also asked Miller "if he would come back to the precinct and make a formal statement." *Id.* at Tr. 22:24-25, 23:11. Miller traveled on his own to the precinct, arriving there with his father between 1:30 p.m. and 2:00 p.m.

## II.    The Questioning of Miller at the Precinct

Upon arriving at the precinct on the afternoon of April 14, Miller was separated from his father and placed in an office for questioning.[1] He was not handcuffed nor given the *Miranda* warnings when he arrived.

---

[1] Miller was later moved to a different office, where he was also questioned. *See id.* at 88:18-20.

### A.  Miller's First Written Statement

Miller was first questioned by Detective Ronald Pereira.  At approximately 3:10 p.m., he gave his first written statement, stating that he "was in the house for [the] majority of the day" but "went out a couple of times."  Dkt. 27, Ex. 23 (First Written Statement).  He also said that his "cousin called [him] a couple of times [b]ut [he] missed most of the call[s] because [he] was sleepin [sic]."  *Id.*  Only later did his wife allegedly tell him that "something just happened to Carlos," at which point Miller says he "went to the hospital."  *Id.*

According to Detective Pereira's testimony at the *Huntley/Dunaway* hearing, he then believed Miller to be a witness because "he may have saw something regarding the homicide" – not a suspect.  Dkt. 28, Tr. 159:19-20, 165:6-7.  Nonetheless, Detective Pereira acknowledged that he knew Miller's father owned a car similar to the one reported to be at the crime scene.  *See id.* at Tr. 160:5-9.  He also testified that, while he never told Miller that he was free to leave, he insisted that Miller "could have left" if he wanted to.  *Id.* at Tr. 166:7-8.

### B.  Miller's Second Written Statement

Miller remained at the precinct after giving his first written statement with approximately eight hours passing between his first and second written statements.  During this time, Miller remained in the precinct office and was always accompanied by an officer.  He was given food, which he threw up, and permitted to use the bathroom on his own.  *See id.* at Tr. 126:14-22.  Miller was not read his *Miranda* warnings.  Although he was intermittently questioned, the detectives were then focused on questioning Cruz about Frazier's murder.  *See id.* at Tr. 88:1.  When asked why Miller remained "at the precinct for eight hours while you spoke with Carlos Cruz if [Miller] was not a suspect," one detective testified that "[Miller] never asked me to leave."  *Id.* at Tr. 88:11, 89:23-25.  Detective Martin also testified that, during these hours, Miller "[n]ever asked to be able

to go home and come back," "[n]ever asked to continue it another time," and "[n]ever asked to go out and get something to eat." *Id.* at Tr. 122:18-25.

After Miller gave his first statement at 3:10 p.m., Detectives Robert Martin and Michael Garrity took over questioning him. Detective Martin had reviewed Miller's first statement, in addition to knowing that Miller was Cruz's cousin, had a criminal history, and that his father owned a car similar to the one at the crime scene. Around 10:00 p.m., Cruz first implicated Miller, stating that Miller was present when Frazier was shot.[2] *See id.* at Tr. 94:12-14. Detective Martin then relayed to Miller that Cruz "is saying that you were there," *id.* at Tr. 94:18-21, and asked Miller "[w]hat do you have to say about that," *id.* at Tr. 95:5. Detective Martin did not yet tell Miller that Cruz had identified him as the shooter. *See id.* at Tr. 95:9:11.

Around 11:30 p.m., Miller gave his second written statement, stating that "[m]y cousin called me and ask[ed] me could I get him a gun." Dkt. 27, Ex. 24 (Second Written Statement). He insisted that he rejected Cruz's request. But when Cruz came to visit him shortly thereafter, Cruz told him, "I think I could get one from Brooklyn," and Miller went with him to Brooklyn. Although Miller said he "didn't see [Cruz] get anything," Cruz later said to Miller: "[C]ome next time I gonna need you to hold me down. I said, ok!" *Id.* The next night, Cruz called and asked Miller to meet him. According to Miller, he went, "pull[ing] up behind my cousin[']s car and just sat there just to hold him down," at which point he saw a man approach Cruz's car and heard "shots go off." *Id.* As his cousin ran toward his car, the man shot at Cruz. Miller says he "was scared shit less" and fled the scene alone. *Id.*

---

[2] According to Detective Bulding, Cruz gave his first statement, which did not implicate Miller, around 2:10 p.m. He then gave this second statement, which implicated Miller, around 10:10 p.m. *See id.* at Tr. 38:5-11.

At this point, Miller still had not been read his *Miranda* warnings.  When asked to explain

this, Detective Martin stated that he still did not view Miller to be a suspect.  *See* Dkt. 28, Tr. 97:2-

4.[3]

### C.  Miller's Third Statement

Approximately forty-five minutes later, at 12:15 a.m. on the morning of April 15, Miller

gave his third written statement.  Shortly beforehand, Detective Martin left the room that Miller

was in to review his second statement.  Upon returning to the office, Detective Martin said: "[Cruz]

is telling me that you got the gun from him."  *Id.* at Tr. 105:12-14.  Detective Garrity also testified

that Detective Martin told Miller that "[Cruz] is giving you up, you know, he's going to put it all

on you," Dkt. 28, Ex. 1 at Tr. 255:8-10, and "[a]re you going to defend yourself.  You're going to

let him put this all on you, you know," *id.* at Tr. 255:23-25.

In his third written statement, Miller again admitted to being with Cruz when he obtained

the gun.  According to Miller's statement, "[t]wo weeks prior to" Frazier's death, his "cousin called

[him] and asked [him] can I get him some guns like T.I."  Dkt. 27, Ex. 25 (Third Written

Statement).  Although over the phone he refused to help Cruz, he later went with him to Brooklyn

but stayed in the car while Cruz and his daughter "were gone like 15-20 min."  *Id.*

### D.  The *Miranda* Warnings

Miller was read his *Miranda* warnings at approximately 12:48 a.m. – about thirty minutes

after giving his third statement.  *See* Dkt. 27, Ex. 26 (Miranda Form).  Miller waived those rights.

*See id.*  When asked what led him to give the *Miranda* warnings at that point in time, Detective

---

[3] Assistant District Attorney ("ADA") George Suminski, who later took Miller's videotaped statements, testified that arresting Miller for Frazier's homicide would not have been authorized until there was "a statement in the form of a confession or a full statement."  *See id.* at Tr. 131:9-13.  He explained that it was the office's "position that we weren't going to use one of these potential defendants against the other.  We were waiting for admissions by both parties."  *Id.* at Tr. 131:20-24.

Martin testified that he did so after Miller "said he shot his cousin in the leg." Dkt. 28, Tr. 67:13-20.  Detective Martin further testified that he "g[a]ve [Miller] more information about what [Cruz] is telling me," including that Miller "was there, that he got the gun and he shot," after the third written statement.  *Id.* at Tr. 112:8-14.  Still, Detective Martin insisted that he believed Miller only to be a witness.  *See id.* at Tr. 113:2-6.

### E.  Miller's Fourth Statement

After receiving the *Miranda* warnings, Miller gave a fourth written statement around 1:00 a.m.  In this statement, Miller said that Cruz called him that evening and asked him, "are you still gonna hold me down," to which Miller said "yes."  Dkt. 27, Ex. 27 (Fourth Written Statement).  He drove to where Cruz was, went to "talk to [him] at the passenger side of the car," and then returned to his car to wait.  *Id.*  While waiting, he "hear[d] gun shots" and "s[aw] my cousin (Carlos) getting out of the car and running toward me."  *Id.*  He then wrote:

> [Cruz] threw the stuff in the passenger seat, and said cousin come on just shoot me in the leg.  So I was scared I didn't know what to do.  I just grab the gun and shot[,] got in my car a[nd] pulled off.

*Id.*  Miller also told the detectives that he had hidden the gun.

### F.  Miller's Fifth Statement

More than an hour later, at 2:25 a.m., Miller gave his fifth written statement.  Beforehand, Detective Martin said to Miller:

> [L]isten, you were right there, you saw [Cruz] come out of the car with the gun in the hand, you had to have seen him shoot into the car. . . . [N]ow I'm playing my whole hand to . . . him.  Listen, he's telling me you were there, he's telling me you got the gun.  He's also telling me you did it.  He's telling me you shot this girl.

Dkt. 28, Tr. 120:2-10.  Miller's fifth written statement reads as follows:

> On Saturday my cousin call me and told me that he would be come-ing down to holla at me about what we talk about on the phone.  So when he got there we were talking and he aske[d] me to "bang" his wife.  I told him I don't want to be involved.  He told me that he

6

would give me $1000, chain, and he would buy the gun.  So we went to Bklyn and he got the gun and then we went home and he left to go back to Boston.  On Sunday he come back to N.Y. with his girl.  He called me and told me that he was at KFC.  I was in the house sleepin[g].  He calls me again to let me know that he shoppin[g].  So he let[ting] me know that he's getting close.  So when he calls me the last time he say[s] go to the spot.  So I go and when he get there I walk up to the pas[se]nger side door and just started shooting.  Carlos ran to my car and say (don't forget to shoot me in the leg).  So I shot.  I drove off the scen[e].

Dkt. 27, Ex. 28 (Fifth Written Statement).

After providing this statement, the police drove Miller – who was then handcuffed – to locate the gun.  *See* Dkt. 28, Tr. 74:16-24.  He "directed" them to a "parking lot of a public housing development," where they found "a black plastic bag laying on the ground" with a gun inside.  *Id.* at Tr. 75:24-25, 76:3-6, 76:16.

### G.  The Videotaped Confession

Around 4:30 a.m., ADA Suminski, with Detective Bulding present, took a videotaped statement from Miller.  Prior to obtaining Miller's statement, ADA Suminski again read Miller his *Miranda* warnings on camera and Miller said that he understood his rights and waived them.  *See* Dkt. 27, Ex. 29, Tr. 3:10-4:7 (Transcript of Videotaped Confession).  Miller's videotaped statement repeated much of what had already been said in Miller's fourth and fifth written statements, including that Cruz asked him "to bang my wife or something like that" and offered him "1,000 cash, a chain, and [that Cruz would] buy the gun," *id.* at Tr. 4:17-22, and that he went with Cruz to Brooklyn to obtain the gun, *see id.* at Tr. 8:17-25.  Miller further stated that he and Cruz had gone to the scene of the crime ahead of time and, on the night that Frazier was shot, he "just started shooting and then when [he] shot the lady in the car, whatever, I ran to my car and Carlos ran behind me and said yo, Cuz, don't forget to shoot me in my leg."  *Id.* at Tr. 5:6-9.  During the videotaped statement, ADA Suminski also reviewed Miller's prior written statements

to confirm that it was his handwriting and that he had signed each of them.  *See id.* at Tr. 27:2-28:23.

Shortly after, at around 5:10 a.m., Miller was formally arrested.  *See* Dkt. 28, Tr. 25:5-7.

## III.    The Trial Proceedings

Miller was indicted on April 29, 2008.  *See* Dkt. 27, Ex. 30.  Prior to trial, Miller moved to suppress his written and videotaped statements, and the court held a *Huntley/Dunaway* hearing. Following the hearing, the trial court denied Miller's motion, concluding that:

> [Miller] voluntarily went to the 43rd precinct accompanied by his father. He sat unrestrained in at least two unlocked offices, while other detectives worked around him. He was allowed to eat and use the bathroom.  The defendant never asked to leave or invoked his right to remain silent.

Dkt. 27, Ex. 1 at 43 (Petitioner's Appellate Brief).  While acknowledging that Miller had been at the precinct "for more than 17 hours from the time the defendant arrived until the video statement concluded," it nonetheless determined that "the questioning of the defendant was not continuous or coercive."  *Id.* (emphasis in original); *see also id.* at 44 ("The detectives did nothing to indicate to the defendant that he was not free to leave.").  As such, it held that Miller's first three written statements were admissible because he had not been in custody at the time, and his post-*Miranda* written and video statements were admissible because they were "voluntarily given" and not coerced."  *See id.* at 44.

On June 29, 2010, following trial, Miller was convicted by a jury of one count of murder in the first degree and one count of criminal possession of a weapon in the second degree.  As a second violent felony offender, Miller was sentenced to life imprisonment without parole for the murder conviction and fifteen years imprisonment, to run concurrently, in addition to five years of post-release supervision.  *See* Dkt. 28, Ex. 5, Tr. 20:14-20.

**IV.     The Direct Appeal & State Post-Conviction Proceedings**

In February 2012, Miller, represented by counsel from the Office of the Appellate Defender, appealed his conviction and sentence.  In a 97-page brief, appellate counsel raised two issues: (1) whether the court erred in denying Miller's motion to suppress his written and videotaped statements, and (2) whether the court erred in informing the jury, without any limiting instruction, that Miller's co-defendant, Cruz, had already been convicted in this case.  *See* Dkt. 27, Ex. 1.

On November 13, 2012, the Appellate Division, First Department affirmed Miller's conviction. *See People v. Miller*, 100 A.D.3d 466 (1st Dep't 2012).  Through appellate counsel, Miller sought leave to appeal to the New York Court of Appeals, but his application was denied. *See* Dkt. 27, Ex. 4 (Dec. 20, 2012 Ltr.); *People v. Miller*, 22 N.Y.3d 957 (2013).

In August 2014, Miller, proceeding *pro se*, filed a petition for a writ of coram nobis in the First Department. He argued that he had received ineffective assistance from his appellate counsel because his appeal "omitted a meritorious argument" that the trial court improperly began *voir dire* prior to concluding the suppression motion.  Dkt. 27, Ex. 5 at 10-11 (Petitioner's Coram Nobis Petition).  This was denied on December 11, 2014.  *See People v. Miller*, 2014 N.Y. Slip Op. 92435 (U), 2014 WL 6979485 (1st Dep't 2014).  Miller appealed the denial of this petition pursuant to C.P.L. § 450.90(1), *see*, Dkt. 27, Ex. 8, which the New York Court of Appeals denied on July 2, 2015, *see People v. Miller*, 25 N.Y.3d 1204 (2015).

In November 2015, Miller, proceeding *pro se*, then sought to vacate his conviction pursuant to C.P.L. § 440.10, alleging that his trial counsel was ineffective for (1) failing to interview and call his parents as witnesses; (2) failing to argue that, because of an open case for which he was represented, he should not have been questioned without his attorney present; (3) failing to obtain

an expert witness to testify about false confessions; (4) not permitting him to testify at trial; and (5) introducing his co-defendant Cruz's statements implicating him as the shooter at trial. *See* Dkt. 27, Ex. 10 (Petitioner's § 440.10 Motion). On June 8, 2017, the court denied Miller's motion – in part on procedural grounds, and in part on the merits. *See* Dkt. 27, Ex. 13 (Order Denying Petitioner's § 440.10 Motion). Miller's motion requesting re-argument was denied. *See* Dkt. 27, Exs. 14, 16. On December 27, 2018, the First Department granted Miller's request for an extension to appeal the denial of his § 440.10 motion. *See* Dkt. 27, Ex. 19. On January 23, 2019, Miller sought leave to appeal the § 440.10 decision to the First Department. *See* Dkt. 27, Ex. 20. The First Department denied his request on March 26, 2019. *See* Dkt. 27, Ex. 22 (*People v. Miller*, N.Y. Slip Op. 66242(U) (Mar. 26, 2019)).

## V.    Federal Habeas Proceedings

On February 26, 2018, Miller, proceeding *pro se*, filed the present habeas petition pursuant to § 2254. On June 8, 2018, Miler notified the Court that he had a motion still pending in state court. *See* Dkt. 4. As such, the Court vacated its order requiring the Attorney General of New York to answer Miller's habeas petition. *See* Dkt. 5. On March 22, 2019, the Court granted the State's request – which Miller did not object to – to stay proceedings to ensure exhaustion of Miller's claims in state court. *See* Dkt. 22. On April 4, 2019, after being notified that the state court had denied Miller's outstanding motion, the Court lifted the stay. *See* Dkt. 25. On May 10, 2019, the State filed its opposition to Miller's habeas petition. *See* Dkt. 27. Miller replied on October 17. *See* Dkt. 35.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may only grant a petition for habeas corpus if the state court's adjudication "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016). "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) (internal quotations omitted).

## DISCUSSION

**I.    Whether Miller's Statements Were Obtained in Violation of *Miranda***

Miller contends that his six statements – five written and one videotaped – were improperly admitted at his trial because the "police failed to give *Miranda* warnings to petitioner until long after he was considered a suspect and subjected to custodial interrogation." Pet. at 6. He asserts that his first three written statements were unlawfully obtained because he was in custody at the time and thus should have been given the *Miranda* warnings. He further argues that his post-*Miranda* statements were also inadmissible because, although he had by then received the *Miranda* warnings, they were not sufficiently attenuated from his prior three statements.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court "adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination." *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011). These measures, however, apply only to a "custodial interrogations . . . where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Id.* at 270 (quoting *Stansbury v. California*, 511 U.S. 318,

11

322 (1994) (per curiam); *see also Dickerson v. United* States, 530 U.S. 428, 435 (2000) (explaining "that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment'"). Determining whether a defendant was in custody requires an objective analysis with "[t]wo discrete inquiries": "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  Relevant facts include "whether a suspect is or is not told that she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation."  *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (internal citations omitted); *see also Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.").  This inquiry does not "depend[] . . . on the subjective views harbored by either the interrogating officers or the person being questioned."  *Stansbury*, 511 U.S. at 323.

Even if a defendant's initial statement is obtained in violation of *Miranda*, that does not necessarily render a subsequent statement also inadmissible.  As the Supreme Court has stated,

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.  Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Oregon v. Elstad*, 470 U.S. 298, 309 (1985); *see also Tankleff*, 135 F.3d at 244 ("[I]t does not follow that these later statements must be suppressed as 'fruit' of the original *Miranda* violation."). Accordingly, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" because "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Elstad*, 470 U.S. at 314.  But, in an instance where it seems the "interrogators question first and warn later" deliberately, the inquiry is modified to ask "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Missouri v. Seibert*, 542 U.S. 600, 611-12 (2004).  Thus, when the *Miranda* warnings are given mid-questioning, certain facts bear on whether post-*Miranda* statements can be admissible, including "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615.

### A.  The State Court Decision[4]

Reviewing Miller's assertion that his *Miranda* rights were violated, the First Department concluded that "[t]he [trial] court properly denied defendant's motion to suppress statements made

---

[4] The relevant state court decision for this analysis is the First Department's affirmance of Miller's conviction on direct appeal.  *See* Gov't Opp. at 18.  When the last state court opinion denies a petitioner's claim summarily, courts "look through the subsequent unexplained denials" to the last reasoned state court opinion addressing that claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991).  Because the court's denial of Miller's § 440.10 motion did not address his *Miranda* claim, the Court turns to the First Department's decision on direct appeal.  *See Hayes v. Lee*, No. 11-CV-1365 (KMK), 2015 WL 5943677, at *30 (S.D.N.Y. Oct. 13, 2015) ("[T]he Third Department's written decision on Petitioner's direct appeal represents the last-reasoned state court decision to address Claims 1 and 5(a)(c)."); *Finley v. Graham*, No. 12-CV-9055 (KMK), 2014 WL 10965412, at *17 (S.D.N.Y. Aug. 26, 2014) (reviewing "[t]he Second Department's decision on Petitioner's direct appeal" because it "represents the last reasoned state court decision to address this claim" (citing *Ylst*, 501 U.S. at 803)).

to law enforcement personnel" because "[t]he record supports the hearing court's finding that when defendant made his pre-*Miranda* statements, a reasonable innocent person in defendant's position would not have thought he was in custody." *People v. Miller*, 100 A.D.3d 466, 466 (1st Dep't 2012) (citing both New York and federal law).  It reasoned that "Defendant voluntarily went to the precinct," "he was never restrained in any way, and neither the questioning nor the atmosphere was coercive." *Id.*  Regarding Miller's post-*Miranda* statements, the First Department concluded that these "were also voluntarily made" and, "[f]urthermore, the videotaped statement was attenuated from the pre-*Miranda* statements." *Id.*

### B.  The Pre-*Miranda* Statements

As previously described, Miller provided three written statements at the precinct at 3:10 p.m. and 11:25 p.m. on April 14 and 12:15 a.m. on April 15 before detectives read him his *Miranda* warnings.  Here, there is no dispute regarding the circumstances surrounding Miller's questioning. Rather, the only dispute is whether – as a result of those circumstances – Miller was "in custody" as understood under *Miranda* and its progeny.  *See Keohane*, 516 U.S. at 112-13 (explaining this inquiry "calls for application of the controlling legal standard to the historical facts," which thus presents "a 'mixed question of law and fact' qualifying for independent review").  For the following reasons, the Court concludes that the state court's determination that Miller was not in custody during this period of time was neither "contrary to" nor "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Several factors demonstrate the reasonableness of the state court's conclusion that a reasonable person in Miller's position would not "have felt he or she was not at liberty to terminate the interrogation and leave." *Keohane*, 516 U.S. at 112.  First, after Detective Bulding asked him

14

to come to the precinct to make a "formal statement" about Frazier's death, Miller went voluntarily. Dkt. 28, Tr. 22:24-25. In contrast to his co-defendant Cruz, who was driven there in the back of a police car, Miller drove himself. *See id.* at Tr. 22:13-14. Whether a defendant comes voluntarily to a police station is something that the Supreme Court has previously considered in concluding that a defendant was not in custody. *See, e.g.*, *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (noting that the defendant "came voluntarily to the police station").

Second, although Miller was at the precinct for a lengthy period of time prior to being read his *Miranda* warnings, it is reasonable to conclude that he was free to leave. Approximately eight hours passed between his first and second written statements, and then another hour before he gave his third written statement. It was only after he gave that third written statement that he was read his *Miranda* warnings. During this time, Miller remained in an office at the precinct. He was not handcuffed and had not been placed under arrest. *See* Dkt. 28, Ex. 1, Tr. 223:22-25. He was given and permitted to use the bathroom without a police escort. *See id.* at Tr. 224:8-12. In his petition, Miller does not assert that the detectives told him that he could not leave. And several detectives explicitly testified that Miller was free to leave at any point but never asked or suggested that he wanted to do so. *See* Dkt. 28, Tr. 60:23-25, 61:1-4. Moreover, Miller does not assert – nor is there anything in the record suggesting – that he was searched while at the precinct or threatened by any of the detectives. Considering these facts together, it was reasonable for the state court to conclude that "none of [the detectives] did anything to suggest to [Miller] that his freedom of movement had been restricted." *Miller*, 100 A.D.3d at 466. This Court cannot say, as is required for habeas relief under AEDPA, that "fairminded jurists" would not "disagree on the correctness of the state court's decision" that there was no restriction on Miller's freedom during these hours. *Etherton*, 136 S. Ct. at 1151.

The reasonableness of the state court's conclusion is further buttressed by the fact that, in analyzing similar facts, courts have routinely found that the defendant was not deemed to have been in custody.  In *Oregon v. Mathiason*, for instance, the defendant, who "had not been arrested or otherwise formally detained," was questioned in the police station and informed that the police believed that he committed a burglary, even falsely telling him that his fingerprints were found at the scene.  429 U.S. at 492.  It was only after the defendant confessed that he was given the *Miranda* warnings, after which a videotaped confession was filmed.  Nonetheless, the Supreme Court concluded that the defendant had not been in custody at the time of his pre-*Miranda* confession because "there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way."  *Id.* at 495.  And while *Mathiason* differs in certain respects, including that the defendant there was questioned for only an hour-and-a-half and then left the police station, the Supreme Court's underlying rationale for concluding it was not a custodial interrogation is equally applicable here:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.  But police officers are not required to administer *Miranda* warnings to everyone whom they question. . . . Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

*Id*.

Miller's arguments as to why the state court erred in finding that he was not in custody do not persuade this Court otherwise.  He first notes the location of the questioning – the precinct – and the length of time that he was questioned. *See* Reply at 14-15 (referring to it as a "'marathon' routine of questioning a suspect"); *id.* at 15 ("It is difficult to imagine a more police dominated environment than behind a closed door in a[n] interrogation room at police headquarters.").  But the Supreme Court has considered similar – if not, identical – assertions and firmly held that these

16

two circumstances are not alone sufficient for finding that a defendant was in custody.  The fact that questioning took place at a police station, for instance, does not itself make it custodial in nature.  *See Cruz v. Miller*, 255 F.3d 77, 81-82 (2d Cir. 2001).  And while the length of time that a person is questioned is surely relevant, it too is not dispositive.  *See Wilson v. Henderson*, 584 F.2d 1185, 1188 (2d Cir. 1978) ("We are not of the belief, however, that the crucial factor in determining a Fifth Amendment violation should be the length of time between questioning.").

Miller next argues that he was in custody because the detectives considered him a suspect from the time he was asked to come to the precinct.[5]  He explains that, prior to asking him to come in to give a formal statements, the detectives were already aware that he was Cruz's cousin, that he had a criminal record, and that his father owned a car similar to the one seen fleeing the crime scene.  He also argues that the questioning, which became "increasingly accusatory," made evident that they believed he played a role in Frazier's death.  Reply at 9; *see also id.* at 13 ("With the passage of time, the tone of the questioning changed as the interrogators increased the confrontational nature of the interrogation.").  For instance, Detective Martin even testified that, once Cruz implicated Miller, he told Miller this, asking "[w]hat do you have to say about that." Dkt. 28, Tr. 94:18-21, 95:5; Dkt. 28, Ex. 4 at 502:4-6 (Detective Martin: "I didn't tell him the whole information that I had.  I gave him a piece saying that, you know, your cousin is putting you there, putting you at the scene.").

Although the detectives insisted that they only viewed Miller as a witness at this point in time, even if they had suspected that he had been involved in the murder, that would not have rendered the interview custodial.  In *California v. Stansbury*, the Supreme Court clearly stated

---

[5] Miller also argues that because he "was a parolee," he "knew it was incumbent upon him to cooperate with the police."  Reply at 10.  A defendant's subjective mindset, however, is not relevant to this analysis.  *See Stansbury*, 511 U.S. at 323.

"that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." 511 U.S. at 324; *id.* at 325 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue[.]"). Moreover, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police." *Innis*, 446 U.S. at 300-01. Here, the state court reasonably found that neither the detectives' questioning nor their conduct transformed Miller's interview into a custodial interrogation.

In any event, whatever conclusion this Court might reach if conducting an independent review of the *Miranda* issue is not at issue. Rather, the sole inquiry is whether the state court's adjudication was reasonable and it "fit[] within the matrix of [the Supreme Court's] prior decisions." *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004). For the foregoing reasons, the state court's decision did so. The Court thus affirms its ruling that Miller's first three written statements were properly admitted at trial because he was not in custody at the time.

### C. The Post-*Miranda* Statements

Miller next contends that his two written and one videotaped statements made after being read his *Miranda* warnings were also inadmissible because "they were not sufficiently attenuated from the earlier ones." Pet. at 6. Here, too, the Court concludes that the state court's ruling that Miller's post-*Miranda* statements were properly admitted was reasonable. *See Miller*, 100 A.D.3d at 466.

As an initial matter, because the state court reasonably determined that Miller was not in custody when he made his first three statements and those statements were thus properly elicited, the inquiry here is simply whether Miller voluntarily waived his *Miranda* rights prior to making

the subsequent three statements.  Miller was read his *Miranda* writings twice – first, orally and in

writing, at 12:48 a.m. and then again orally at 4:30 a.m. Both times, he knowingly and voluntarily

waived his rights.  *See* Dkt. 27, Exs. 26, 29.  "An express written or oral statement of waiver of

the right to remain silent or of the right to counsel is usually strong proof of the validity of that

waiver."  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *see also Seibert*, 542 U.S. at 608-

09 ("[G]iving the warnings and getting a waiver has generally produced a virtual ticket of

admissibility; maintaining that a statement is involuntary even though given after warnings and

voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end

with the finding of a valid waiver.").  Nothing in the record suggests that Miller was coerced to

waive his rights or did so unknowingly.  Miller's sole argument as to why his waiver was neither

knowing nor voluntary is that he did not know that his parents were at the precinct asking to speak

with him.  But "[e]vents occurring outside of the presence of the suspect and entirely unknown to

him surely can have no bearing on the capacity to comprehend and knowingly relinquish a

constitutional right."  *Moran v. Burbine*, 475 U.S. 412, 422 (1986).  As such, Miller's assertion

that his waiver of his *Miranda* rights was not "the product of a free and deliberate choice rather

than intimidation, coercion, or deception," *id.* at 421, is unpersuasive.  The state court was thus

objectively reasonable in concluding that Miller voluntarily waived his rights and his subsequent

three statements were admissible.

Even assuming *arguendo*, however, that Miller had been in custody when he gave his prior

statements and they were inadmissible, there has been no showing that "the circumstances

surrounding petitioner's unwarned [earlier] confessions were so coercive as to prevent him from

making a subsequent knowing and voluntary waiver of his rights, thereby requiring the suppression

of his post-*Miranda* confession."  *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003).  "[I]n

determining the voluntariness of petitioner's post-*Miranda* confessions, we must examine the totality of the circumstances," including "1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police."  *Id*.

As an initial matter, even if Miller was in custody prior to receiving the *Miranda* warnings, that alone does not necessarily reflect that his statements were a product of coercion.  *See Tankleff*, 135 F.3d at 244 (noting that a court "cannot rely solely on the *Miranda* presumption that custodial interrogation is coercive in determining whether [a defendant's] second confession must be suppressed").  For many of the reasons previously noted, Miller's questioning was not coercive. Miller came to the precinct voluntarily and unaccompanied, was not handcuffed throughout the questioning, was able to go the bathroom, was given food, and was never told that he was not free to leave or threatened in any way.  Nor is this an instance where the petitioner is young or inexperienced with the legal system; rather, he had previously been convicted of two felonies. Gov't Opp. at 42; *see also Colon v. Ercole*, No. 09-CV-5168 (LTS), 2010 WL 9401, at *38 (S.D.N.Y. Jan. 4, 2010).  Moreover, by the time of Miller's videotaped statement conducted by ADA Suminski when the *Miranda* warnings were administered for the second time, two hours had passed since his last written statement. Therefore, if any coercion surrounded his written statements, it "had sufficiently dissipated by the time [Miller] gave his videotaped confession." *Vasquez v. Senkowski*, 54 F. Supp. 2d 208, 218 (S.D.N.Y. 1999).  As such, with all evidence suggesting that Miller spoke to detectives and waived his *Miranda* rights voluntarily, Miller could not show that his post-*Miranda* statements were tainted by his prior questioning.

Finally, to the extent that Miller argues in his reply brief that the post-*Miranda* statements were the result of a "two-step interrogation" – meaning a "deliberate tactic to defer *Miranda* warnings until after elicitation of a complete confession" – this too does not overcome the

assumption of reasonableness given to the state court's decision.  Reply at 25.  "The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Seibert*, 542 U.S. at 611-12. Contrary to Miller's assertion, there is no evidence that the detectives employed the "two-step interrogation" tactic here, as it was described in *Seibert*.  Prior to receiving the *Miranda* warnings, Miller had not yet confessed to killing Frazier and, according to the detectives' testimony, was only a potential witness to Frazier's shooting.  Although he eventually admitted to being at the crime scene and shooting Cruz in the leg, Miller did not confess to Frazier's death until after he was read his *Miranda* warnings.  This, therefore, is distinguishable from *Seibert*, where "there was little, if anything, of incriminating potential left unsaid" by the defendant prior to receiving the *Miranda* warnings.  *Id.* at 616.  And, for the reasons previously discussed in this section, the circumstances surrounding Miller's questioning were not such that the *Miranda* warnings received at 12:48 a.m. and 4:30 a.m. could not "function 'effectively.'"  *Id.* at 611-12.

In conclusion, the Court affirms the state court's ruling that Miller's post-*Miranda* written and videotaped statements were properly admitted at trial.  The Court thus denies Miller's request for habeas relief on the grounds that his rights under *Miranda* were violated.

## II.     Ineffective Assistance Claims

Miller also contends that he is entitled to habeas relief because he received ineffective assistance from both his trial and appellate counsel.

Demonstrating ineffective assistance of counsel requires establishing two prongs: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *see also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (explaining that "reasonable probability" means "the result of the proceeding would have been different").  In a habeas proceeding, however, "it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002) (internal citation omitted). Accordingly, where AEDPA applies to an ineffective-assistance claim, "*double deference* is appropriate when evaluating *Strickland* claims[.]" *Waiters v. Lee*, 857 F.3d 466, 477 n.20 (2d Cir. 2017) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  Moreover, the Supreme Court has "cautioned . . . that a court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Bell*, 535 U.S. at 702.

### A.  Trial Counsel

Miller argues that his trial counsel was ineffective for the following reasons: (1) failing to interview and call his parents as witnesses; (2) failing to argue that, because of an open case for which he had representation, he should have had that attorney present during questioning; (3) failing to obtain an expert witness to testify about false confessions; (4) not permitting Miller to testify at trial; and (5) introducing at trial the statements of co-defendant Cruz that implicated Miller as the shooter.  Although his petition does not explicitly allege this conduct to be the basis for his ineffectiveness claim, the Court will presume as much given that Miller relied on these five grounds for the ineffectiveness claim in his § 440.10 motion.  *See Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (liberally construing *pro se* pleadings and drawing all reasonable inferences in the *pro se* litigant's favor); Gov't Opp. at 27 n.24.

### 1.   The Procedural Bar

The state court rejected three of Miller's arguments for ineffective assistance of trial counsel on procedural grounds.  It stated: "Defendant's claims [1] that his attorney did not retain an expert, [2] that he refused to allow the defendant to testify at the hearing and trial and [3] that he introduced his non-testifying co-defendant's statements into evidence are all matters of record in the trial and must be summarily rejected as he unjustifiably failed to raise these issues in his appeal."  Dkt. 27, Ex. 13 at 4 (citing *People v. Cuadrado*, 9 N.Y.3d 362 (2007)).

Under New York law, "the [state] court must deny a motion to vacate a judgment when . . . [,] although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure . . . to raise such ground or issue upon an appeal actually perfected by him." N.Y. C.P.L. § 440.10(2)(c).  As such, "New York law requires a state court to deny a motion to vacate a judgment based on a constitutional violation where the defendant unjustifiably failed to argue the constitutional violation on direct appeal despite a sufficient record."  *Sweet v. Bennett*, 353 F.3d 135, 139 (2d Cir. 2003).  And when "an independent and adequate state procedural rule" bars review in a state court – as § 440.10(2)(c) does – "federal habeas review of the claims is barred."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (holding that § 440.10(2)(c) is an independent and "adequate state procedural bar").[6]

---

[6] The only exception to this procedural bar is if the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.  Such circumstances are not present here.

In sum, the state court reasonably determined that § 440.10(2)(c) barred review of Miller's arguments that his trial counsel was ineffective for (1) failing to obtain an expert on false confessions; (2) refusing to allow him to testify; and (3) introducing Cruz's statements at trial. *See* Dkt. 27, Ex. 13 at 4. Each of these arguments was evident from the face of the trial record, and thus available to be raised in Miller's direct appeal. New York law and courts have established that these are the type of claims procedurally barred from review pursuant to § 440.10(2)(c).[7] *See, e.g.*, *People v. Cuadrado*, 9 N.Y.3d at 365. Accordingly, these arguments are equally unreviewable in a habeas proceeding in this Court. *See Sweet*, 353 F.3d at 140; *Gilford v. Racette*, No. 13-CV-5581 (ALC), 2015 WL 4639975, at *18-19 (S.D.N.Y. Aug. 5, 2015) (concluding that the petitioner's ineffective assistance of counsel claim was barred by § 440.10(2)(c)'s application).

### 2. The Merits

The state court further reviewed and rejected Miller's two remaining arguments on the merits – that counsel failed to interview or call Miller's parents as witnesses and that he did not investigate whether, due to Miller's open case at the time of questioning, his attorney should have been present. *See* Dkt. 27, Ex. 13 at 4-10. Noting the federal and state standards for ineffective assistance, the state court first explained that Miller "was represented by a very experienced attorney, . . . who has tried numerous homicide cases," and, "[f]ar from being ineffective, [he] presented a vigorous defense at both the hearing and trial in which he argued, among other things, in his opening statement, his cross examination of the people's witnesses and in summation, that

---

[7]After holding that these claims were procedurally barred, the state court also considered and rejected the arguments on the merits. *See* Dkt. 27, Ex. 13 at 4. The court's decision to do so, however, does not affect the conclusion that the claims were in fact barred. *See Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) ("[W]e are barred from reaching the merits of his first three federal claims, under the ruling in *Harris* that federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim.").

the defendant's statements were false and the result of coercion and manipulation on the part of the precinct detectives." *Id.* at 5.  It then reviewed and denied Miller's specific claims individually.

### a. Speaking To and Calling Miller's Parents

Miller next contends that "trial counsel made no effort to interview any of Miller's family members" and "[h]ad counsel interviewed either of these witnesses he would have discovered that the police kept Devon Miller incommunicado and refused to let the family members see or speak to him during this interrogation," "would have discovered that the family members had been told that defendant could not go anywhere until he had completed the statement and that they themselves were told not to call a lawyer for their son." Dkt. 27, Ex. 10 at 6.  In state post-conviction proceedings, Miller submitted his own affidavit, as well as one from his mother and father. *See* Dkt. 27, Ex. 10.  His father's affidavit states that after he was questioned by the police, he "asked for [his] son," but was told that he could not speak with him because Miller was "keeping Carlos company" and that Miller did not need a lawyer.  Dkt. 27, Ex. 10 at 42.  His mother's affidavit similarly states that, while Miller was being questioned, she was at the precinct but not permitted to bring her son food and told that he did not need a lawyer.  *See* Dkt. 27, Ex. 10 at 44. Miller also filed a document, reflecting questions that he asked his counsel, including why he did not call his parents as witnesses, to which counsel responded that "[t]hey had no credibility[.]'" Dkt. 27, Ex. 10 at 6; *see also id.* at Ex. B.

The state court rejected this claim on two grounds.  It first held that it was not actually evident that counsel had not spoken to Miller's parents because his parents' affidavits "are undated and have been submitted many years after the proceedings."  Dkt. 27, Ex. 13 at 6.   It then determined that his parents' testimony nonetheless "would have added nothing of relevance to the

issues that were presented to the Judge" in light of the other evidence and the fact that "detectives were extensively examined and cross-examined." *Id*.

The state court's resolution of this ineffective assistance claim was neither "contrary to, [n]or involved an unreasonable application of" *Strickland*. 28 U.S.C. § 2254(d). "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987). Therefore, "[a] failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel." *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002).

Here, trial counsel's performance was not deficient for failing to call Miller's parents as witnesses. First, their testimony would likely have been cumulative because most of what Miller asserts that they would have testified to was already before the jury through direct and cross-examination of other witnesses. The jury, for instance, heard that Miller and his father arrived at the precinct together but were separated for questioning, and that Miller's father was questioned but left uncharged unlike his son. *See, e.g.*, Dkt. 27, Ex. 5, Tr. 554-55. Moreover, during cross-examination, Detective Martin acknowledged that "some [of Miller's] family members were in the precinct downstairs" waiting for him and that Miller asked to "go downstairs to speak to my family." *Id.* at Tr. 556:13-14, 564:7-8. Defense counsel further had Detective Martin testify that when Miller's family "asked [him] how much longer it would be," Detective Martin "lied to them and said, well, he's just trying to keep Mr. Cruz company, for moral support." *Id.* at Tr. 557:3-6. Second, in addition to being cumulative, defense counsel also could have reasonably concluded – as he asserted in post-conviction proceedings – that it would not benefit Miller to call his parents because "they had no credibility." *See* Dkt. 27, Ex. 10 at 39.

26

As such, counsel's performance was "within the range of acceptable strategic and tactical alternatives and did not cause the representation to fall below the constitutionally acceptable level mandated by *Strickland*." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). And, even assuming *arguendo* that Miller could establish deficient performance (which the Court does not believe), Miller nonetheless could not show that he was prejudiced by this omission. The state court thus reasonably concluded that trial counsel was not ineffective for failing to call Miller's parents as witnesses.

### b. The Open Case at the Time of Questioning

Lastly, Miller asserts that, at the time he was questioned in the precinct, he had an open case for which he had legal representation and thus he should not have been questioned without that counsel present. *See* Dkt. 27, Ex. 10 at 3 n.2. He argues that his trial counsel was ineffective for not "investigat[ing] and rais[ing] before the Court the fact [that] he had not been allowed to speak with his attorney at the precinct" because this would have provided another basis to exclude his pre- and post-*Miranda* statements. *Id.* at 4, 7. The state court determined that this "allegation is meritless." Dkt. 27, Ex. 13 at 6-7. It explained that, while Miller did have a pending case, it was for trespass – an entirely unrelated matter to Frazier's shooting – and therefore "there was no possibility that questioning on the instant matter would elicit any incriminating information on the trespass case." *Id.* at 7 ("[T]here is no evidence that defendant's trespass case was in any way related to the murder investigation in which the defendant was being questioned.").

The state court's rejection of this argument was also reasonable. As the state court explained, "[i]t is settled law that a person who has an attorney on an unrelated case, in which he is not in custody, as here, may be questioned about a matter that is not related to the prior

representation." *Id.* at 6-7.  (citing *People v. Bing*, 76 N.Y.2d 331, 350 (1990)).[8]  As the state court rightly found, Miller was not in custody when he was questioned at the precinct on April 14 and 15.  Nor has he demonstrated – let alone suggested – that the questioning about Frazier's homicide had any relation to the trespass matter.  Thus, the state court concluded that it would have been futile under New York law for Miller's counsel to have raised this issue.  *See* Dkt. 27, Ex. 13 at 7 (citing *People v. Stultz*, 2 N.Y.3d 277, 287 (2004) ("A defendant is not denied effective assistance of trial counsel merely because counsel does not make a motion or argument that has little or no chance of success.")).

It is not this Court's role to review the state court's adjudication of a state-law issue.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").  The Court thus accepts the state court's conclusion that it would have been futile for counsel to have raised this issue on Miller's behalf.  But as such, this leaves no room to find Miller's trial counsel ineffective for failing to raise this issue.  It is well-established that "[t]he failure to include a meritless argument does not fall outside the 'wide range of professionally competent assistance' to which Petitioner was entitled." *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001); *see also Lafler v. Cooper*, 566 U.S. 156, 167 (2012) ("Because the objection upon which his ineffective-assistance-of-counsel claim was premised was meritless, [the petitioner] could not demonstrate an error entitling him to relief.").

---

[8] Miller's § 440 motion relies on *People v. Lopez*, 16 N.Y.3d 375 (2011), for support.  *See* Dkt. 27, Ex. 10 at 7-8.  But *Lopez* is inapposite because the defendant there was in custody while being questioned.

### B. Appellate Counsel

Miller contends that his appellate counsel was also ineffective because he failed to argue in his appeal that the "trial court[] err[ed] by compelling counsel to commence jury selection before conclusion of the suppression hearing." Pet. at 8; *see also* Dkt. 27, Ex. 5 at 11. *Strickland*'s two-prong ineffective-assistance analysis also applies to claims regarding appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). But when "attempting to demonstrate that appellate counsel's failure to raise a state claim constitutes deficient performance, it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). Rather, a petitioner must show that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Id.*

The state court's denial of Miller's ineffective assistance of appellate counsel claim was reasonable. His appellate counsel filed an extensive (97-page) brief, as well as a 35-page reply brief, on his behalf. *See* Dkt. 27, Ex. 1; Dkt. 27, Ex. 3 (Petitioner's Appellate Reply Brief). In these briefs, appellate counsel raised two colorable issues: Miller's statements were admitted in violation of *Miranda* and the trial court erred in informing the jury that Cruz had already been convicted. Indeed, one of these issues is the focus of Miller's petition presently before this Court.

Appellate counsel will not be deemed ineffective simply because Miller believes another issue should have been raised instead of or in addition to the others. It is well established that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Robbins*, 528 U.S. at 288; *see also Jones v. Barnes*, 463 U.S. 745, 754 (1983) (refusing to establish a *per se* rule that appellate counsel has "a duty to raise every 'colorable' claim

suggested by a client").  It was thus within appellate counsel's reasonable discretion to determine

which issues on appeal would offer Miller the best chance of overturning his conviction.  *See*

*Burger v. Kemp*, 483 U.S. 776, 784 (1987) ("[T]he 'process of winnowing out weaker claims on

appeal and focusing on those' more likely to prevail, far from being evidence of incompetence, is

the hallmark of effective appellate advocacy.").  As the Supreme Court has noted, "[a] brief that

raises every colorable issue runs the risk of burying good arguments[.]"  *Jones*, 463 U.S. at 753.

Moreover, Miller has offered nothing to suggest that "counsel omitted significant and

obvious issues while pursuing issues that were clearly and significantly weaker."  *Id.*  Rather, the

record is quite clear that the argument that *voir dire* should not have started prior to concluding

the *Huntley/Dunaway* hearing was a weak, if not unmeritorious, claim.  First, the trial judge and

Miller's trial counsel had a short colloquy about this issue, during which defense counsel did not

object to beginning *voir dire* at this time.  *See* Dkt. 28, Ex. 1, Tr. 199-200.  Second, and more

significantly, appellate counsel would have struggled to establish that Miller was prejudiced by

this based on the defense counsel's following statement to the judge during jury selection:

> I just want to go back on the record for one thing, your Honor; that is, I know the Court
> has not rendered a decision with respect to the Huntley Hearing, and I'm proceeding on the
> assumption that the Court is not going to, I'm not saying whether you are or not, but *my
> voir dire is geared toward the assumption you're not suppressing any statements*.  Of
> course, if you do decide to suppress the statements, and I talk about my client's confession,
> I would expect that there would be a mistrial, and we would start all over again picking a
> new jury.

*Id.* at Tr. 16:7-16 (emphasis added).  It is therefore clear that counsel based his *voir dire* strategy

on the assumption – that was proven to be correct shortly thereafter – that the court would deny

Miller's suppression motion.  Accordingly, whether *voir dire* began before or after the conclusion

of the *Huntley/Dunaway* hearing could not have reasonably affected the outcome of Miller's trial

and Miller could not have established prejudice under *Strickland*.

The Court, therefore, affirms the state court's denial of Miller's ineffective assistance claim on this basis as well.

## CONCLUSION

For the foregoing reasons, Miller's habeas petition is denied.  The Clerk of Court is respectfully directed to close this case and to mail a copy of this opinion to Miller.

Dated:      July 31, 2020
              New York, New York

_____
Ronnie Abrams
United States District Judge

31